UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | | |
|---|---|---|
| BRETT WATTS AND DALE WARD, | § | |
| | § | |
| Plaintiffs, | § | |
| | § | |
| vs. | § | Case No. 3:12-CV-4256 |
| | § | |
| BLUE CROSS AND BLUE SHIELD OF | § | |
| TEXAS, HEALTH CARE SERVICE | § | |
| CORPORATION, AND BLUE CROSS | § | |
| BLUE SHIELD ASSOCIATION | § | |
| | § | |
| Defendants | § | |

## COMPLAINT – CLASS ACTION

NOW COMES Plaintiffs, Brett Watts and Dale Ward, and bring this action on behalf of themselves and all others similarly situated against Defendants, Blue Cross and Blue Shield of Texas (BCBSTX), a division of Health Care Service Corporation, a Mutual Legal Reserve Company, an independent licensee of the Blue Cross and Blue Shield Association, Health Care Service Corporation, and Blue Cross Blue Shield Association, for damages and restitution.

## FACTS

1.  Plaintiffs, Brett Watts and Dale Ward, (hereinafter "Plaintiffs") bring this action on behalf of themselves and other subscribers of Blue Cross and Blue Shield of Texas (BCBSTX), a division of Health Care Service Corporation, a Mutual Legal Reserve Company, an independent licensee of the Blue Cross and Blue Shield Association, Health Care Service Corporation, and Blue Cross Blue Shield Association ("BCBSA") (collectively "Defendants") for damages and restitution. Specifically, this action seeks to

recover damages in the form of a refund of inflated premiums that BCBSTX has charged Texas subscribers as a result of an ongoing a conspiracy in violation of Section 1 of The Sherman Antitrust Act (15 U.S.C. §§ 1–7); an attempt to monopolize in violation of Section 2 of the Sherman Act; and a violation of Section 3 of The Clayton Antitrust Act of 1914 (15 U.S.C. §§ 12–27, 29 U.S.C. §§ 52–53).  BCBSTX and the thirty-seven (37) BCBSA  member health plans, and as a result of anti-competitive conduct Defendants have engaged in to establish and maintain monopoly power throughout Texas.

2.      BCBSTX is by far the largest health insurance company operating in Texas, and currently exercises market power in the commercial health insurance market throughout Texas. As of January 1, 2009, 40% of the Texas residents who subscribe to full-service commercial health insurance (group plans and individual policies) are subscribers of BCBSTX vastly more than the next largest full-service commercial insurer, Aetna, which carries just 23% of such subscribers.

3.      The dominant market share enjoyed by BCBSTX is the direct result of an illegal conspiracy in which thirty-seven of the nation's largest health insurance companies have agreed that they will not compete with BCBSTX, and that BCBSTX will have the exclusive right to do business in the State of Texas, so long as it limits its competition with any of its thirty-seven co-conspirators in each of their assigned geographic areas. These market allocation agreements are implemented through Blue Cross and Blue Shield license agreements executed between BCBSA, a licensing vehicle that is owned and controlled by all of the Blue Cross and Blue Shield plans, and each individual Blue Cross and Blue Shield licensee, including BCBSTX.  Through the terms of these per se illegal

license agreements, the independent Blue Cross and Blue Shield entities throughout the country, including BCBSTX, have explicitly agreed not to compete with one another, in direct violation of the Antitrust Acts.  By so agreeing, they have attempted to entrench and perpetuate the dominant market position that each Blue Cross and Blue Shield entity has historically enjoyed in its specifically defined geographic market.

4.      Defendants' illegal conspiracy has perpetuated BCBSTX monopoly power throughout Texas, which has resulted in skyrocketing premiums for Texas BCBSTX enrollees for over a decade.  BCBSTX's anti-competitive behavior, and the lack of competition BCBSTX faces because of its monopoly power and anti-competitive behavior, has led to higher costs, resulting in higher premiums charged to BCBSTX customers.  As a result of these inflated premiums, Health Care Service Corporation now has a surplus of more than $620 million.

5.      These inflated premiums would not be possible if the market for health insurance in Texas were truly competitive.  Full and fair competition is the only answer to artificially-inflated prices, and competition is not possible so long as BCBSTX and BCBSA are permitted to enter into agreements that have the actual and intended effect of restricting the ability of thirty-seven of the nation's largest health insurance companies from competing in Texas.

## JURISDICTION AND VENUE

6.      This action is instituted under Sections 4 and 16 of the Clayton Act, 15 U.S.C. §§ 15 and 26, to recover treble damages under 15 U.S.C. § 15(a) and costs of suit, including reasonable attorneys' fees, against Defendants for the injuries sustained by Plaintiffs by

reason of the Defendants' violations of Section 1 of The Sherman Antitrust Act (15 U.S.C. §§ 1–7); Section 2 of the Sherman Act; and Section 3 of The Clayton Antitrust Act of 1914 (15 U.S.C. §§ 12–27, 29 U.S.C. §§ 52–53).  Subject matter jurisdiction is conferred upon this Court by Sections 4 and 16 of the Clayton Act, 15 U.S.C. §§ 15(a) and 26, and by 28 U.S.C. §§ 1331 and 1337.

7.    Venue is proper in this district under Sections 4 and 12 of the Clayton Act, 15 U.S.C. §§ 15 and 22, and 28 U.S.C. § 1391(b), (c) and (d) because the Defendants resided, transacted business, maintain their principal Texas office, were found, or had agents in this District.  Part of the events giving rise to Plaintiffs' claims occurred, and/or a substantial portion of the affected interstate trade and commerce described below, was carried out in this District.

8.    This Court has personal jurisdiction over each Defendant because, among other things, each: (a) transacted business throughout the United States, including in this District; (b) participated in collecting premiums and issuing insurance coverage in the United States, including in this District; (c) had substantial contacts with the United States, including in this District; (d) resided in this District by maintaining a principal office; and/or (e) engaged in a scheme and conspiracy in violation of Section 1 of the Sherman Act that was directed at and had the intended effect of causing injury to persons residing in, located in, or doing business throughout the United States, including in this District.

9.    All members of the Class are residents of only Texas.

**PARTIES**

10.    Plaintiff, Brett Watts, is domiciled in Dallas County, Texas.  Plaintiff Watts has an

individual health insurance policy number ZGP893514281 and group number 000006 with, and paid premiums to BCBSTX.

11.     Plaintiff, Dale Ward, is domiciled in Dallas County, Texas.  Plaintiff Ward had a group health insurance policy number 084311 with, and paid premiums to BCBSTX.

12.     Defendant Health Care Service Corporation (also "HCSC") d/b/a Blue Cross and Blue Shield of Texas, is a foreign corporation, which may be served through its registered agent for service of process, General Counsel Of Health Care Service Corp., 1001 East Lookout Drive, Richardson TX 75082-4144.

13.     BCBSTX is the health insurance plan operating under the Blue Cross and Blue Shield trademarks and trade names in Texas.  Like other Blue Cross and Blue Shield plans nationwide, BCBSTX is the largest health insurer in the State of Texas, as measured by number of subscribers, within its service area, which is defined as the state of Texas. HCSC is the fourth largest health insurer in the country by total medical enrollment, with more than 13 million members in Texas, Illinois, Oklahoma, and New Mexico. Approximately 7.7 million of HCSC's members are served by BCBSTX in 220 of the 254 counties in Texas.  BCBSTX may be served through its registered agent for service of process, General Counsel Of Health Care Service Corp., 1001 East Lookout Drive, Richardson TX 75082-4144.

14.     Blue Cross Blue Shield Association is a corporation organized under the state of Illinois and headquartered in Chicago, Texas.  It is owned and controlled by thirty-eight (38) health insurance plans, including BCBSTX, that operate under the "Blue Cross and Blue Shield" trademarks and trade names. BCBSTX was created by these plans and operates as

a licensor for these plans.  Health insurance plans operating under the Blue Cross and

Blue Shield trademarks and trade names provide health insurance coverage for

approximately 100 million – or one in three – Americans.  A BCBS licensee is the largest

health insurer, as measured by number of subscribers, in forty-four (44) states.  BCBSA

may be served through its registered agent for service of process, Roger G. Wilson, 225

N. Michigan Ave., Chicago, IL 60601.

## TRADE AND COMMERCE

15.     BCBSTX and the 37 other health plans that own and control BCBSA are engaged in

interstate commerce and in activities substantially affecting interstate commerce, and the

conduct alleged herein substantially affects interstate commerce. BCBSA enters into

agreements with health insurance companies throughout the country that specify the

geographic areas in which those companies can compete.

16.     The conduct of the Defendants has substantial effects on trade and commerce in the State

of Texas.

## CLASS ACTION ALLEGATIONS

17.     Pursuant to Federal Rule of Civil Procedure Rule 23, Plaintiffs bring this action on behalf

of themselves and the members of the following proposed Class:

> All persons and entities who paid health insurance premiums to
> BCBSTX for individual or group full-service commercial health
> insurance at any time since four (4) years prior to commencement
> of this action and were domiciled in Texas and solely residents of
> Texas on October 22, 2012.

18.     Excluded from the Class are: (i) Defendants, any entity in which Defendants have a

controlling interest, and Defendants legal representatives, predecessors, successors, and

assigns; (ii) governmental entities; (iii) Defendants employees, officers, directors, agents and representatives and their family members; and (iv) the Judge and staff to whom this case is assigned, and any member of the Judge's immediate family.  Plaintiffs reserve the right to amend the class definition as appropriate after class discovery is completed.

19.     The Class is so numerous and geographically dispersed in the State of Texas that joinder of all members is impracticable. While Plaintiffs do not know the number and identity of all members of the Class, Plaintiffs believe that there are tens of thousands of Class members, the exact number and identities of which can be obtained from BCBSTX.

20.     There are questions of law or fact common to the Class and such questions predominate over questions affecting individual members.  The common legal and factual questions include, but are not limited to, the following:

a.      Whether the restrictions set forth in the BCBSA license agreements are per se violations of Section 1 of The Sherman Antitrust Act; an attempt to monopolize in violation of Section 2 of the Sherman Act; and a violation of Section 3 of The Clayton Antitrust Act or are otherwise prohibited thereunder;

b.      Whether, and the extent to which, premiums charged by BCBSTX to class members have been artificially inflated as a result of the illegal restrictions in the BCBSA license agreements;

c.      Whether the use of Most Favored Nation ("MFN") provisions in the BCBSTX provider agreements are anti-competitive, by raising barriers of entry and by increasing the costs of care and insurance;

d.      Whether, and the extent to which, premiums charged by BCBSTX have been artificially inflated as a result of the anti-competitive practices adopted by BCBSTX; and

e.      Whether the restrictions set forth in the BCBSA license agreements are per se violations of Section 1 of The Sherman Antitrust Act; an attempt to monopolize in violation of Section 2 of the Sherman Act; and a violation of Section 3 of The Clayton Antitrust Act.

21.     Plaintiffs' claims are typical of the claims of the members of the Class, because Plaintiffs

purchased full-service commercial health insurance products from BCBSTX in the same

manner as members of the Class, and their interests coincide with and are not antagonistic

to other members of the Class.

22.     Plaintiffs will fairly and adequately protect the interests of the members of the Class

because it is in their best interest to prosecute the claims alleged herein to obtain full

compensation due to them for the unfair and illegal conduct of which they complain.

23.     Plaintiffs have retained and is represented by counsel who are competent and experienced

in the prosecution of antitrust and class action litigation.  Plaintiffs are willing and

prepared to serve the Court and the Class members in a representative capacity with all of

the obligations and duties material thereto and is determined to diligently discharge those

duties by vigorously seeking the maximum possible recovery for Class members.

24.     The prosecution of separate actions by individual members of the Class would create a

risk of inconsistent and varying adjudications, establishing incompatible standards of

conduct for Defendants.

25.     A class action is superior to other available methods for the fair and efficient adjudication

of this controversy.  The Class is readily definable and is one for which BCBSTX has

records.  Prosecution as a class action will eliminate the possibility of repetitious

litigation.  Treatment of this case as a class action will permit a large number of similarly

situated persons to adjudicate their common claims in a single forum simultaneously,

efficiently, and without the duplication of effort and expense that numerous individual

actions would produce.  Class treatment will also permit the adjudication of relatively small claims by many Class members who otherwise could not afford to litigate an antitrust claim such as is asserted in this Complaint.  This class action does not present any difficulties of management that would preclude its maintenance as a class action.

## FACTUAL BACKGROUND

26.   BCBSTX enjoys unrivaled market dominance within Texas, enrolling approximately 40 percent of the market of non-elderly subscribers of full-service commercial health insurance plans.  When considering full-service preferred provider organization ("PPO") subscribers alone, BCBSTX's market dominance is nearly 45 percent of full-service PPO plan subscribers statewide are enrolled with BCBSTX.

27.   BCBSTX's market dominance in Texas is the result of a conspiracy between BCBSTX and the thirty-seven other insurance companies that license the Blue Cross and/or Blue Shield brands to unlawfully divide and allocate the geographic markets for health insurance coverage in the United States.  That conspiracy is implemented through the Blue Cross and Blue Shield license agreements that each licensee has entered into with BCBSA.  As detailed herein, the member health insurance plans of BCBSA, including BCBSTX, entered into a series of licensing arrangements that have insulated BCBSTX and the other health insurance plans operating under the Blue Cross and/or Blue Shield trademarks from competition in each of their respective service areas.

28.   This series of agreements has enabled BCBSTX to acquire and maintain a grossly disproportionate market share for health insurance products in Texas, where BCBSTX enjoys market and monopoly power.  The situation in Texas is not unique, however, as

other health insurance plans operating under the Blue Cross and Blue Shield trademarks and trade names reap similar benefits in their respective service areas across the United States.

29.    BCBSTX has used its market and monopoly power in Texas to engage in a number of anti-competitive practices.  For example, upon information and belief, BCBSTX has required key health care providers to agree to so-called "most favored nation" clauses ("MFNs") in their contracts with BCBSTX.  These clauses ensure that BCBSTX receives the best pricing for health care services in the market.  If a health care provider does not agree to the MFN, that provider will not remain in or become a part of BCBSTX's network, which is generally an unacceptable result because BCBSTX controls the vast majority of subscribers in Texas.  Faced with this prospect, providers capitulate to BCBSTX's demands, including MFNs.  The MFNs restrict competition by preventing competitors from negotiating for lower costs and thus raising the prices other health insurers must pay to providers.

30.    Because the BCBSA licensing agreements exclude rival health insurance plans from the market and BCBSTX's MFNs ensures that its competitors may not negotiate lower health care provider costs, BCBSTX faces little pressure to constrain its own costs.  The MFN, by limiting the ability of an insurer to compete with BCBSTX, thus also compounds the exclusion of BCBSTX's rival health insurance plans from the market and the deprivation of consumers of choice in health insurance products.  With few other health insurance plan options to compete with, BCBSTX can raise premiums (and thereby recoup its costs) without any concern that its subscribers may switch to a rival insurance plan.  The few

consumers who subscribe to rival insurance plans face higher premiums as well, as these plans pass on to their subscribers the high costs set by BCBSTX with health care providers.

31.   Upon information and belief, because BCBSTX has implemented MFNs that ensure it receives the best rates in the market without the risk of low cost competition, health care providers have responded by increasing prices to cover the discounts that BCBSTX receives through its MFNs.  Thus, what was supposed to be a discount turns out to be a premium to providers, thereby artificially raising prices for health care services.  Again, consumers lose.

32.   Defendants' anti-competitive practices, by reducing the choices available to health insurance consumers and increasing the cost of health care in Texas, have raised the premiums that Texas residents must pay to obtain health insurance.  BCBSTX's rival health insurance plans are excluded from the market, and the few rival plans that have broken into the Texas market must pay significantly higher rates to health care providers.

33.   The skyrocketing cost of BCBSTX health insurance coverage in Texas tells the story of BCBSTX's abuse of its market and monopoly power at the expense of health care consumers in Texas.

### HISTORY OF THE BLUE CROSS AND BLUE SHIELD PLANS AND OF BCBSA

34.   The history of the Blue Cross and Blue Shield plans demonstrates that the plans arose independently, that they jointly conceived of the Blue Cross and Blue Shield marks in a coordinated effort to create a national brand that each would operate within its local area, and that they quickly developed into local monopolies in the growing market for health

care coverage.  While originally structured as non-profit organizations since the 1980s, these local "Blue" plans have increasingly operated as for-profit entities: either by formally converting to for-profit status, or by generating substantial surpluses.

35.     The history of BCBSA demonstrates that it was created by the local Blue plans and is entirely controlled by those plans.  Moreover, the history of BCBSA demonstrates that the origin of the geographic restrictions in its trademark licenses was an effort to avoid competition between the various Blue plans, and to ensure that each Blue plan would retain a dominant position within its local service area.

36.     In 1934, an administrator named E.A. von Steenwyck helped develop a pre-paid hospital plan in St. Paul, Minnesota. In his effort to help sell the plan, he commissioned a poster that showed a nurse wearing a uniform containing a blue Geneva cross, and used the symbol and the name "Blue Cross" to identify the plan.  This is believed to be the first use of the Blue Cross symbol and name as a brand symbol for a health care plan. Within the year, other pre-paid hospital plans began independently using the Blue Cross symbol.

37.     In 1937, Blue Cross plan executives met in Chicago.  At that meeting, American Hospital Association ("AHA") officials announced that pre-paid hospital plans meeting certain standards of approval would receive institutional membership in the AHA.  In 1938, the Committee on Hospital Service adopted a set of principles to guide its "approval" of prepaid hospital plans.  One such principle was that the plans would not compete with each other.  When the approval program went into effect, there were already 38 independently formed prepaid hospital plans with a total of 1,365,000 members.

38.     In 1939, the Blue Cross mark was adopted as the official emblem of those prepaid

hospital plans that received the approval of the AHA.

39.    In 1941, the Committee on Hospital Service, which had changed its name to the Hospital

Service Plan Committee, introduced a new standard: that approval would be denied to

any plan operating in another plan's service area.  Contrary to the principles that plans

would not compete and that plans would not operate in each others' service areas, the

independently formed pre-paid hospital plans, now operating under the Blue Cross name,

engaged in fierce competition with each other and often entered each others' territories.

The authors of *The Blues: A History of the Blue Cross and Blue Shield System*, which

BCBSA sponsored and its officers reviewed prior to publication, describe the heated

competition between the various Blue Cross plans at that time:

> The most bitter fights were between intrastate rivals . . . . Bickering
> over nonexistent boundaries was perpetual between Pittsburgh and
> Philadelphia, for example.... John Morgan, who directed a Plan in
> Youngstown, Ohio, for nearly twenty-five years before going on to
> lead the Blue Cross Plan in Cincinnati, recalled: "In Ohio, New
> York, and West Virginia, we were knee deep in Plans." At one
> time or another, there were Plans in Akron, Canton, Columbus,
> Cleveland, Cincinnati, Lima, Portsmouth, Toledo, and
> Youngstown .... By then there were also eight Plans in New York
> and four in West Virginia. . . . Various reciprocity agreements
> between the Plans were proposed, but they generally broke down
> because the Commission did not have the power to enforce them.

40.    For many years, Cross-on-Cross competition continued, as described in Odin Anderson's

*Blue Cross Since 1929: Accountability and the Public Trust*, which was funded by the

Blue Cross Association, a predecessor to BCBSA.  Anderson points to Illinois and North

Carolina, where "[t]he rivalry [between a Chapel Hill plan and a Durham plan] was

fierce," as particular examples, and explains that though "Blue Cross plans were not

supposed to overlap service territories," such competition was "tolerated by the national Blue Cross agency for lack of power to insist on change."

41.     By 1975, the Blue Cross plans had a total enrollment of 84 million.

42.     The development of what became the Blue Shield plans followed, and imitated, the development of the Blue Cross plans. These plans were designed to provide a mechanism for covering the cost of physician care, just as the Blue Cross plans had provided a mechanism for covering the cost of hospital care. Similarly, the Blue Cross hospital plans were developed in conjunction with the AHA (which represents hospitals), while the Blue Shield medical society plans were developed in conjunction with the American Medical Association ("AMA") (which represents physicians).

43.     Like the Blue Cross symbol, the Blue Shield symbol was developed by a local medical society plan, and then proliferated as other plans adopted it.

44.     In 1946, the AMA formed the Associated Medical Care Plans ("AMCP"), a national body intended to coordinate and "approve" the independent Blue Shield plans.  When the AMCP proposed that the Blue Shield symbol be used to signify that a Blue Shield plan was "approved," the AMA responded, "It is inconceivable to us that any group of state medical society Plans should band together to exclude other state medical society programs by patenting a term, name, symbol, or product."  In 1960, the AMCP changed its name to the National Association of Blue Shield Plans, which in 1976 changed its name to the Blue Shield Association.

45.     By 1975, the Blue Shield plans had a total enrollment of 73 million.

46.     Historically, the Blue Cross plans and the Blue Shield plans were fierce competitors.

During the early decades of their existence, there were no restrictions on the ability of a Blue Cross plan to compete with or offer coverage in an area already covered by a Blue Shield plan. Cross-on-Cross and Shield-on-Shield competition also flourished.

47. However, by the late 1940s, the Blue plans faced growing competition not just from each other, but also from commercial insurance companies that had recognized the success of the Blue plans and were now entering the market. Between 1940 and 1946, the number of hospitalization policies held by commercial insurance companies rose from 3.7 million to 14.3 million policies. While the Blues remained dominant in most markets, this growth of competition was a threat. In particular, unlike the Blue plans, these commercial insurance companies were able to offer uniform nationwide contracts, which were attractive to large employers or unions with members located in different cities and states.

48. From 1947 to 1948, the Blue Cross Commission and the AMCP attempted to develop a national agency for all Blue plans, to be called the Blue Cross and Blue Shield Health Service, Inc., but the proposal failed. One reason given for its failure was the AMA's fear that a restraint of trade action might result from such cooperation.

49. Even when the Plans were putatively cooperating, as they appeared to be in the 1950s while competing with commercial insurers for the opportunity to provide insurance to federal government employees, they were at war. As the former marketing chief of the National Association of Blue Shield Plans admitted, "Blue Cross was separate; Blue Shield was separate. Two boards; two sets of managements. Rivalries, animosities, some days . . . pure, unadulterated hatred of each other."

50.     To address competition from commercial insurers and competition from other Blue plans, and to ensure "national cooperation" among the different Blue entities, the plans agreed to centralize the ownership of their trademarks and trade names.  In prior litigation, BCBSA has asserted that the local plans transferred their rights in the Blue Cross and Blue Shield names and marks to the precursors of BCBSA because the local plans, which were otherwise actual or potential competitors, "recognized the necessity of national cooperation."

51.     Thus, in 1954, the Blue Cross plans transferred their rights in each of their respective Blue Cross trade names and trademarks to the AHA.  In 1972, the AHA assigned its rights in these marks to the Blue Cross Association.

52.     Likewise, in 1952, the Blue Shield plans agreed to transfer their ownership rights in their respective Blue Shield trade names and trademarks to the National Association of Blue Shield Plans, which was renamed the Blue Shield Association in 1976.

53.     During the 1970s, local Blue Cross and Blue Shield plans all over the U.S. began merging.  By 1975, the executive committees of the Blue Cross Association and the National Association of Blue Shield Plans were meeting four times a year.  In 1978, the Blue Cross Association and the National Association of Blue Shield Plans (now called the Blue Shield Association) consolidated their staffs, although they retained separate boards of directors.

54.     In 1982, the Blue Cross Association and the Blue Shield Association merged to form BCBSA.  At that time, BCBSA became the sole owner of the various Blue Cross and Blue Shield trademarks and trade names that had previously been owned by the local

plans.

55.     In November 1982, after heated debate, BCBSA's member plans agreed to two

propositions: that by the end of 1984, all existing Blue Cross plans and Blue Shield plans

should consolidate at a local level to form Blue Cross and Blue Shield plans; and that by

the end of 1985, all Blue plans within a state should further consolidate, ensuring that

each state would have only one Blue plan.  As a result of these goals, the number of

member plans went from 110 in 1984, to 75 in 1989, to 38 today.  However, the goals did

not end competition between Blue plans.  In the early 1980s, for example, Blue Cross of

Northeastern New York and Blue Shield of Northeastern New York competed

head-to-head.

56.     During the 1980s and afterwards, the plans began to operate less like charitable entities

and more like for-profit corporations, accumulating substantial surpluses.  In 1986,

Congress revoked the Blues' tax-exempt status, freeing them to form for-profit

subsidiaries.

57.     In 1992, BCBSA ceased requiring Blue Cross and Blue Shield licensees to be not-

for-profit entities.  As a result, many member plans converted to for-profit status.  One

such plan, now called WellPoint, has grown to become the largest health insurance

company in the country, at least by some measures.  While nominally still characterized

as not-for-profit, BCBSTX and other non-profit Blue plans generate substantial earnings

and surpluses, and pay their senior administrators and officials substantial salaries and

bonuses – often in the multi-million dollar range.

58.     From 1981 to 1986, the Blue plans lost market share at a rate of approximately one

percent per year.  At the same time, the amount of competition among Blue plans, and would and would not compete against each other.  During these meetings, these independent health insurers and competitors agreed to maintain exclusive service areas when operating under the Blue brand, thereby eliminating "Blue on Blue" competition.  However, the Assembly of Plans left open the possibility of competition from non-Blue subsidiaries of Blue plans – an increasing "problem" that had caused complaints from many Blue plans.

percent per year.  At the same time, the amount of competition among Blue plans, and from non-Blue subsidiaries of Blue plans, increased substantially.  As a result of this increased competition, in April of 1987, the member plans of BCBSA held an "Assembly of Plans" – a series of meetings held for the purpose of determining how they would and would not compete against each other.  During these meetings, these independent health insurers and competitors agreed to maintain exclusive service areas when operating under the Blue brand, thereby eliminating "Blue on Blue" competition.  However, the Assembly of Plans left open the possibility of competition from non-Blue subsidiaries of Blue plans – an increasing "problem" that had caused complaints from many Blue plans.

59.    Throughout the 1990s, the number of non-Blue subsidiaries of Blue plans increased, and they continued to compete with Blue plans.  As a result, the member plans of BCBSA discussed ways to rein in such non-Blue branded competition.

60.    At some later date, the Blue Cross and Blue Shield plans together agreed to restrict the territories in which they would operate under any brand, Blue or non-Blue, as well as the ability of non-members of BCBSA to control or acquire the member plans.  These illegal restraints are discussed below.

61.    BCBSA calls itself "a national federation of 38 independent, community-based and locally operated Blue Cross and Blue Shield companies" and "the trade association for the Blue Cross Blue Shield companies."

62.    BCBSA is entirely controlled by its member plans, all of whom are independent health insurance companies that license the Blue Cross and/or Blue Shield trademarks and trade names, and that, but for any agreements to the contrary, could and would compete with

one another.  On its website, BCBSA admits that in its "unique structure," "the Blue

Cross and Blue Shield companies are [its] customers, [its] Member Licensees and [its]

governing Board."

63.     As at least one federal court has recognized, BCBSA "is owned and controlled by the

member plans" to such an extent that "by majority vote, the plans could dissolve the

Association and return ownership of the Blue Cross and Blue Shield names and marks to

the individual plans." *Central Benefits Mut. Ins. Co. v. Blue Cross and Blue Shield Ass'n*,

711 F. Supp. 1423, 1424-25 (S.D. Ohio 1989).

64.     The Blue Cross and Blue Shield licensees control the Board of Directors of BCBSA.  In a

pleading it filed during litigation in the Northern District of Texas, BCBSA admitted that

its Board of Directors consists of "the chief executive officer from each of its Member

Plans and BCBSA's own chief executive officer."  The current chairman of the Board of

Directors, Daniel J. Loepp, is also the current President and CEO of Blue Cross Blue

Shield of Michigan.  The Board of Directors of BCBSA meets at least annually.

65.     The independent Blue Cross and Blue Shield licensees also control BCBSA's Plan

Performance and Financial Standards Committee (the "PPFSC"), a standing committee of

the BCBSA Board of Directors that is composed of nine member-Plan CEOs and three

independent members.

66.     The independent Blue Cross and Blue Shield licensees control the entry of new members

into BCBSA.  In a brief it filed during litigation in the United States Court of Appeals for

the Sixth Circuit, BCBSA admitted that "[t]o be eligible for licensure, [an] applicant ...

must receive a majority vote of [BCBSA's] Board" and that BCBSA "seeks to ensure that

a license to use the Blue Marks will not fall into the hands of a stranger the Association has not approved."

67. The independent Blue Cross and Blue Shield licensees control the rules and regulations that all members of BCBSA must obey.  According to a brief BCBSA filed during litigation in the United States Court of Appeals for the Sixth Circuit, these rules and regulations include the Blue Cross License Agreement and the Blue Shield License Agreement (collectively, the "License Agreements"), the Membership Standards Applicable to Regular Members (the "Membership Standards"), and the Guidelines to Administer Membership Standards (the "Guidelines").

68. The License Agreements state that they "may be amended only by the affirmative vote of three-fourths of the Plans and three-fourths of the total then current weighted vote of all the Plans."  In a brief it filed during litigation in the United States Court of Appeals for the Sixth Circuit, BCBSA described the provisions of the License Agreements as something the member plans "deliberately chose," "agreed to," and "revised."  The License Agreements explicitly state that the member plans most recently met to adopt amendments, if any, to the licenses on November 18, 2010.

69. Under the terms of the License Agreements a plan "agrees . . . to comply with the Membership Standards."  The Guidelines state that the Membership Standards and the Guidelines "were developed by the [PPFSC] and adopted by the Member Plans in November 1994 and initially became effective as of December 31, 1994;" that the Membership Standards "remain in effect until otherwise amended by the Member Plans;" that revisions to the Membership Standards "may only be made if approved by a

three-fourths or greater affirmative Plan and Plan weighted vote;" that "new or revised [G]uidelines shall not become effective . . . unless and until the Board of Directors approves them;" and that "[t]he PPFSC routinely reviews" the Membership Standards and Guidelines "to ensure that . . . all requirements (standards and guidelines) are appropriate, adequate and enforceable."

70.    The independent Blue Cross and Blue Shield licensees police the compliance of all members of BCBSA with the rules and regulations of BCBSA.  The Guidelines state that the PPFSC "is responsible for making the initial determination about a Plan's compliance with the license agreements and membership standards.  Based on that determination, PPFSC makes a recommendation to the BCBSA Board of Directors, which may accept, reject, or modify the recommendation."  In addition, the Guidelines state that "BCBSA shall send a triennial membership compliance letter to each [member] Plan's CEO," which includes, among other things, "a copy of the Membership Standards and Guidelines, a report of the Plan's licensure and membership status by Standard, and PPFSC comments or concerns, if any, about the Plan's compliance with the License Agreements and Membership Standards."  In response, "[t]he Plan CEO or Corporate Secretary must certify to the PPFSC that the triennial membership compliance letter has been distributed to all Plan Board Members."

71.    The independent Blue Cross and Blue Shield licensees control and administer the disciplinary process for members of BCBSA that do not abide by BCBSA's rules and regulations.  The Guidelines describe three responses to a member plan's failure to comply – "Immediate Termination," "Mediation and Arbitration," and "Sanctions" – each

of which is administered by the PPFSC and could result in the termination of a member plan's license.

72.     The independent Blue Cross and Blue Shield licensees control the termination of existing members from BCBSA.  The Guidelines state that based on the PPFSC's "initial determination about a Plan's compliance with the license agreements and membership standards. . . . PPFSC makes a recommendation to the BCBSA Board of Directors, which may accept, reject, or modify the recommendation."  However, according to the Guidelines, "a Plan's licenses and membership [in BCBSA] may only be terminated on a three-fourths or greater affirmative Plan and Plan weighted vote."  In a brief filed during litigation in the Sixth Circuit Court of Appeals, BCBSA admitted that the procedure for terminating a license agreement between BCBSA and a member plan includes a "double three-quarters vote" of the member plans of the BCBSA: "In a double three-quarters vote, each plan votes twice- first with each Plan's vote counting equally, and then with the votes weighted primarily according to the number of subscribers."

73.     The independent Blue Cross and Blue Shield licensees are potential competitors that use their control of BCBSA to coordinate their activities.  As a result, the rules and regulations imposed "by" the BCBSA on the member plans are in truth imposed by the member plans on themselves.

74.     Each BCBSA licensee is an independent legal organization.  In a pleading BCBSA filed during litigation in the Southern District of Florida, BCBSA admitted that "[t]he formation of BCBSA did not change each plan's fundamental independence."  In fact, the License Agreements state that "[n]othing herein contained shall be construed to constitute

the parties hereto as partners or joint venturers, or either as the agent of the other."

75.    The independent Blue Cross and Blue Shield licensees include many of the largest health

insurance companies in the United States.  The largest health insurance company in the

nation by some measures is WellPoint, a BCBSA licensee.  Similarly, fifteen (15) of the

twenty-five (25) largest health insurance companies in the country are BCBSA licensees.

On its website, BCBSA asserts that its members together provide "coverage for more than

99 million individuals – one-in-three Americans" and "contract[] with more hospitals and

physicians than any other insurer."  Absent the restrictions that the independent Blue

Cross and Blue Shield licensees have chosen to impose on themselves, discussed below,

these companies would compete against each other in the market for commercial health

insurance.

76.    In a brief it filed during litigation in the Sixth Circuit Court of Appeals, BCBSA admitted

that the Member Plans formed the precursor to BCBSA when they "recognized the

necessity of national coordination."  The authors of *The Blues: A History of the Blue

Cross and Blue Shield System* describe the desperation of the Blue Cross and Blue Shield

licensees before they agreed to impose restrictions on themselves:

> The subsidiaries kept running into each other – and each other's
> parent Blue Plans – in the marketplace.  Inter-Plan competition had
> been a fact of life from the earliest days, but a new set of
> conditions faced the Plans in the 1980s, now in a mature and
> saturated market.  New forms of competition were springing up at
> every turn, and market share was slipping year by year.  Survival
> was at stake.  The stronger business pressure became, the stronger
> the temptation was to breach the service area boundaries for which
> the Plans were licensed . . . .

77.    On its website, BCBSA admits that "[w]hen the individual Blue companies' priorities,

business objectives and corporate culture conflict, it is our job to help them develop a united vision and strategy" and that it "[e]stablishes a common direction and cooperation between [BCBSA] and the 39 [now 38] Blue companies."  As BCBSA's general counsel, Roger G. Wilson, explained to the Insurance Commissioner of Pennsylvania, "BCBSA's 39 [now 38] independent licensed companies compete as a cooperative federation against non-Blue insurance companies."  One BCBSA member plan admitted in its February 17, 2011 Form 10-K that "[e]ach of the [38] BCBS companies ... works cooperatively in a number of ways that create significant market advantages . . . ."

78.     As the foregoing demonstrates, BCBSA is a vehicle used by independent health insurance companies to enter into agreements that restrain competition.  Because BCBSA is owned and controlled by its member plans, any agreement between BCBSA and one of its member plans constitutes a horizontal agreement between and among the member plans themselves.

### THE HORIZONTAL AGREEMENTS NOT TO COMPETE IN THE LICENSING ARRANGEMENTS BETWEEN BCBSA AND MEMBER PLANS, INCLUDING BCBSTX, ARE PER SE VIOLATIONS OF SECTION 1 OF THE SHERMAN ACT

79.     The rules and regulations of BCBSA, including, but not limited to, the License Agreements, the Membership Standards, and the Guidelines, constitute horizontal agreements between competitors, the independent Blue Cross and Blue Shield licensees, to divide the geographic market for health insurance.  As such, they are a per se violation of Section 1 of the Sherman Act.

80.     Through the License Agreements, which the independent Blue Cross and Blue Shield

licensees created, control, and enforce, each independent Blue Cross and Blue Shield licensee agrees that neither it nor its subsidiaries will compete under the licensed Blue Cross and Blue Shield trademarks and trade names outside of a designated "Service Area." The License Agreement defines each licensee's Service Area as "the geographical area(s) served by the Plan on June 10, 1972, and/or as to which the Plan has been granted a subsequent license."

81.     Through the Guidelines and Membership Standards, which the independent Blue Cross and Blue Shield licensees created, control, and enforce, and with which each licensee must agree to comply as part of the License Agreements, each independent Blue Cross and Blue Shield licensee agrees that at least 80 percent of the annual revenue that it or its subsidiaries generate from within its designated Service Area (excluding Medicare and Medicaid) shall be derived from services offered under the licensed Blue Cross and Blue Shield trademarks and trade names.  This provision directly limits the ability of each Blue plan to generate revenue from non-Blue branded business.  This provision also thereby limits the ability of each plan to develop non-Blue brands that could and would compete with Blue plans.  It further discourages and disincentivizes each plan from developing any non-Blue branded businesses.

82.     Through the Guidelines and Membership Standards, each independent Blue Cross and Blue Shield licensee further agrees that at least two-thirds of the annual revenue generated by it or its subsidiaries from either inside or outside of its designated Service Area (excluding Medicare and Medicaid) shall be attributable to services offered under the Blue Cross and Blue Shield trademarks and trade names.  The Guidelines provide that

national enrollment can be substituted for annual revenue, making the alternative restriction that a plan will derive no less than 66 ⅔ percent of its national enrollment from its Blue-brand business.  This provision directly limits the ability of each Blue plan to generate revenue from non-Blue branded business, and thereby limits the ability of each plan to develop non-Blue brands that could and would compete with Blue plans.  It further discourages and disincentivizes each plan from developing any non-Blue branded businesses.

83.     The one-third cap on non-Blue revenue provides a licensee with minimal, if any, incentive to compete outside its Service Area.  To do so, the licensee would have to buy, rent, or build a provider network under a non-Blue brand, while ensuring that revenue derived from that brand did not exceed the one-third cap.  Should the licensee offer services and products under the non-Blue brand within its Service Area (which is likely, since that is its base of operations), that would further reduce the amount of non-Blue revenue it is permitted to earn from outside its designated area.  Thus, the potential upside of making an investment in developing business outside of a designated area is severely limited, which obviously creates a disincentive from ever making that investment.

84.     In sum, each independent Blue Cross and Blue Shield licensee has agreed with its potential competitors that in exchange for having the exclusive right to use the Blue brand within a designated geographic area, it will derive none of its revenue from services offered under the Blue brand outside of that area, and will derive at most one-third of its revenue from outside of its exclusive area, using services offered under a non-Blue brand.  The latter amount will be further reduced if the licensee derives any of its revenue within

its designated geographic area from services offered under a non-Blue brand.

85.   The foregoing restrictions on the ability of Blue plans to generate revenue outside of their

service areas constitute agreements between competitors to divide and allocate

geographic markets, and therefore are per se violations of Section 1 of the Sherman Act.

86.   More than one Blue Cross and Blue Shield licensee has publicly admitted the existence of

these territorial market divisions. For example, the former Blue Cross licensee in Ohio

alleged that BCBSA member plans agreed to include these restrictions in the Guidelines

in 1996 in an effort to block the sale of one member plan to a non-member that might

present increased competition to another member plan.

87.   The largest Blue licensee, WellPoint, is a publicly-traded company, and therefore is

required by the SEC rules to describe the restrictions on its ability to do business. Thus,

in its Form 10-K filed February 17, 2011, WellPoint stated that it had "no right to market

products and services using the BCBS names and marks outside of the states in which we

are licensed to sell BCBS products," and that "[t]he license agreements with the BCBSA

contain certain requirements and restrictions regarding our operations and our use of the

BCBS names and marks, including . . . a requirement that at least 80% . . . of a licensee's

annual combined net revenue attributable to health benefit plans within its service area

must be sold, marketed, administered or underwritten under the BCBS names and marks"

and "a requirement that at least 66 ⅔% of a licensee's annual combined national revenue

attributable to health benefit plans must be sold, marketed, administered or underwritten

under the BCBS names and marks."

88.   Likewise, in its Form 10-K filed March 9, 2011, Triple-S Salud, the Blue licensee for

Complaint – Page 27

Puerto Rico, explained that "[p]ursuant to our license agreements with BCBSA, at least 80% of the revenue that we earn from health care plans and related services in [its Service Area] and at least 66.7% of the revenue that we earn from (or at least 66.7% of the enrollment for) health care plans and related services both in [and outside its Service Area], must be sold, marketed, administered, or underwritten through use of the Blue Cross Blue Shield name and mark."  Further, the Triple-S licensee stated that the territorial restrictions "may limit the extent to which we will be able to expand our health care operations, whether through acquisitions of existing managed care providers or otherwise, in areas where a holder of an exclusive right to the Blue Cross Blue Shield name and mark is already present."

89.     Despite these public admissions, both BCBSA and its member plans have attempted to keep the territorial restrictions as secret as possible.  When asked by the Insurance Commissioner of Pennsylvania to "[p]lease describe any formal or informal limitations that BSBSA [sic] places on competition among holders of the [Blue] mark as to their use of subsidiaries that do not use the mark," BCBSA's general counsel responded that "BCBSA licensed companies may compete anywhere with non-Blue branded business . . . The rules on what the plans do in this regard are contained in the license.  However, the license terms themselves are proprietary to BCBSA, and ... we would prefer not to share such trade secrets with BCBSA's competitors."

90.     The member plans of BCBSA have agreed to impose harsh penalties on those that violate the territorial restrictions.  According to the Guidelines, a licensee that violates one of the territorial restrictions could face "[l]icense and membership termination."  If a member

plan's license and membership are terminated, it loses the use of the Blue brands, which

BCBSA admits on its website are "the most recognized in the health care industry."  In

addition, in the event of termination, a plan must pay a fee to BCBSA.  According to

WellPoint's February 17, 2011 Form 10-K filing, that "Re-establishment Fee," which was

$98.33 per enrollee as of December 31, 2010, "would allow the BCBSA to 're-establish' a

Blue Cross and/or Blue Shield presence in the vacated service area."

91.     In sum, a terminated licensee would: (a) lose the brand through which it derived the

majority of its revenue; and (b) fund the establishment of a competing health insurer that

would replace it as the Blue licensee in its local area. These penalties essentially threaten

to put out of existence any Blue member plan that breaches the territorial restrictions.

92.     It is unsurprising, then, that most member plans do not operate outside of their Service

Areas.  The territorial restrictions have therefore barred all competition by all of the Blue

plans (other than BCBSTX) from the Texas commercial health insurance market.

93.     Even in the relatively rare instance, in other states, in which Blue plans conduct

operations outside of their Service Areas, they have been required to keep those

operations tightly under control by preventing growth – exactly the opposite of how they

would normally operate.  The relationship between WellPoint and its non-Blue

subsidiary, UniCare, is an illustrative example.  WellPoint reported in its Form 10-K for

the year ending December 31, 1999 that approximately 70 percent of its total medical

membership was sold by its Blue-licensed subsidiary, Blue Cross of California.  In its

Form 10-K for the year ending December 31,2000, this percentage decreased to

approximately 67 percent.  In its Form 10-K for the year ending December 31, 2001, after

WellPoint had acquired the BCBSA member plans operating in Georgia and part of Missouri, it reported that approximately 78 percent of its total medical membership was in its Blue-licensed subsidiaries.  By the time WellPoint filed its 10-K for the year ending December 31, 2005, it had acquired the Blue licensees in fourteen states.  For the first time, it admitted the existence of the territorial restrictions in the BCBSA licenses and stated that it was in compliance with them.  This may explain why, from 1999 to 2002, while other Texas health insurers experienced average revenue growth of 17 percent, UniCare experienced growth of only 1.4 percent in Texas.  During those same years, UniCare experienced virtually no growth in the state of Washington, while overall health insurance revenue in the state grew by 17 percent.  Similarly, in New Jersey from 2000 to 2002, the number of out-of-Service-Area enrollees of WellChoice (now part of WellPoint and known as Empire Blue Cross Blue Shield) did not increase, despite an overall 25 percent growth rate for health insurers in the state during the same period.  In Mississippi, between 2001 and 2002, premium revenue earned by most health insurance companies increased by more than 10 percent, but revenue for the non-Blue business of out-of-state Blue plans was either flat (in the case of UniCare) or negative (in the case of Anthem, now part of WellPoint).

94.     In another example, one Pennsylvania Blue plan, Independence Blue Cross, has 2.4 million Blue-brand commercial health insurance enrollees in its service area of Southeastern Pennsylvania, and has close to 1 million non-Blue brand Medicare and Medicaid enrollees (to which the territorial restrictions do not apply) in Indiana, Kentucky, Pennsylvania, and South Carolina, but its non-Blue brand commercial health

insurance subsidiary, AmeriHealth, which operates in New Jersey and Delaware, has an enrollment of only approximately 130,000, or 4 percent of independence Blue Cross's total commercial health insurance enrollment.

95.    Thus, the territorial restrictions agreed to by all BCBSA members operate to restrain competition by preventing member plans from competing with each other and with non-Blue plans.  These prohibitions on competition apply no matter how favorable the efficiencies and economies of scale that might result from expansion of a Blue into a new area, and no matter how much premiums and other costs might be reduced if competition were permitted.

96.    In addition to the per se illegal territorial restrictions summarized above, the rules and regulations of BCBSA, which BCBSTX and the other independent Blue Cross and Blue Shield licensees created, control, and agree to obey, also include provisions that restrict the ability of non-members of BCBSA to acquire or obtain control over any member plan.

97.    First, the Guidelines state that "[n]either a [Member] Plan nor any Larger Controlled Affiliate shall cause or permit an entity other than a [Member] Plan or a Licensed Controlled Affiliate thereof to obtain control of the [Member] Plan or Larger Controlled Affiliate or to acquire a substantial portion of its assets related to licensable services." Should a non-member wish to obtain such control or assets, it "is invited to apply to become a licensee."  However, as alleged above, the member plans control the entry of new members into BCBSA.  Should a non-member attempt to join BCBSA in order to obtain control of, or to acquire a substantial portion of, the assets of a member plan, the other member plans could block its membership by majority vote.

98.     Second, the License Agreements contain a number of acquisition restrictions applicable

to for-profit Blue Cross and Blue Shield licensees (*i.e.*, to those licensees who would

otherwise be capable of having their shares acquired).  These include four situations in

which a member plan's license will terminate automatically: (1) if any institutional

investor become beneficially entitled to 10 percent or more of the voting power of the

member plan; (2) if any non-institutional investor become beneficially entitled to 5

percent or more of the voting power of the member plan; (3) if any person become

beneficially entitled to 20 percent of more of the member plan's then-outstanding

common stock or equity securities; or (4) if the member plan conveys, assigns, transfers,

or sells substantially all of its assets to any person, or consolidates or merges with or into

any person, other than a merger in which the member plan is the surviving entity and in

which, immediately after the merger, no institutional investor is beneficially entitled to 10

percent or more of the voting power, no non-institutional investor is beneficially entitled

to 5 percent or more of the voting power, and no person is beneficially entitled to 20

percent of more of the then-outstanding common stock or equity securities.  These

restrictions apply unless modified or waived in particular circumstances upon the

affirmative vote both of a majority of the disinterested member plans and also of a

majority weighted vote of the disinterested member plans.  These restraints effectively

preclude the sale of a BCBSA member to a non-member entity, absent special approval.

99.     These acquisition restraints reduce competition in violation of Section 1 of the Sherman

Act and Section 3 of The Clayton Antitrust Act, because they substantially reduce the

ability of non-member insurance companies to expand their business.  In order to expand

into a new geographic area, a non-member insurance company faces the choice of whether to build its own network in that area, or to acquire a network by buying some or all of an existing plan doing business in that area. Through the acquisition restrictions, the Blue plans have conspired to force competitors to build their own networks, and have effectively prohibited those competitors from ever choosing what may often be the more efficient solution of acquiring new networks by purchasing some or all of an existing Blue plan.  Blue provider networks may often be the most cost-effective due to historical tax breaks, favorable legislation, and long-term presence in a region.  By preventing non-Blue entities from acquiring Blue entities and their networks, the acquisition restrictions in the BCBSA licenses effectively force competitors to adopt less efficient methods of expanding their networks, thereby reducing and in some instances eliminating competition.

100.    Since the 1996 adoption of the acquisition restrictions, the only acquisitions of Blue Cross or Blue Shield licensees have been acquisitions by other member plans.  During the period from 1996 to the present, there has been a wave of consolidation among the Blue plans: in 1996, there were 62 Blue licensees; at present, there are only 38.

101.    By agreeing to restrict the pool of potential purchasers of a Blue licensee to other Blue licensees, the member plans of BCBSA raise the costs their rivals must incur to expand their networks and areas of practice, reduce efficiency, and protect themselves and each other from competition.  The net effect is to tend to lessen or to lessen competition and higher premium costs for consumers, including enrollees of BCBSTX.

102.    BCBSTX, as a licensee, member, and part of the governing body of BCBSA, has

conspired with the other member plans of BCBSA to create, approve, abide by, and enforce the rules and regulations of BCBSA, including the per se illegal territorial restrictions in the License Agreements and Guidelines.  Many of the member plans with which BCBSTX has conspired would otherwise be significant competitors of BCBSTX in Texas.

103.    For example, WellPoint is the largest health insurer in the country by total medical enrollment, with approximately 34 million enrollees.  It is the Blue Cross and Blue Shield licensee for Georgia, Kentucky, and portions of Virginia, as well as for California (Blue Cross only), Colorado, Connecticut, Indiana, Maine, Missouri (excluding 30 counties in the Kansas City area), Nevada, New Hampshire, New York, (as Blue Cross Blue Shield in 10 New York City metropolitan and surrounding cities, and as Blue Cross or Blue Cross Blue Shield in selected upstate counties only), Ohio, and Wisconsin, and also serves customers throughout the country through its non-Blue brand subsidiary, UniCare. But for the illegal territorial restrictions summarized above, WellPoint would be likely to offer its health insurance services and products in Texas in competition with BCBSTX. Such competition would have resulted in lower health care costs and premiums paid by BCBSTX enrollees such as Plaintiffs herein.

104.    Over 55 percent of Mississippi residents who subscribe to full-service commercial health insurance (whether through group plans or through individual policies) are subscribers of Blue Cross Blue Shield of Mississippi – vastly more than the next largest full-service commercial insurer.  But for the illegal territorial restrictions summarized above, Blue Cross and Blue Shield of Mississippi would be likely to offer its health insurance services

and products in Texas in competition with BCBSTX.  Such competition would result in lower health care costs and premiums paid by BCBSTX enrollees.

105.    Likewise, approximately 53 percent of Arkansas residents who subscribe to full-service commercial insurance (whether through group plans or through individual policies) are subscribers of Blue Cross Blue Shield of Arkansas – vastly more than the next largest full-service commercial insurer.  But for the illegal territorial restrictions summarized above, Blue Cross Blue Shield of Arkansas would be likely to offer its health insurance services and products in Texas in competition with BCBSTX.  Such competition would result in lower health care costs and premiums paid by BCBSTX enrollees.

106.    Similarly, Blue Cross and Blue Shield of Alabama is the thirteenth largest health insurer in the country by total medical enrollment, with approximately 3.5 million enrollees. Blue Cross and Blue Shield of Alabama holds a stunning 93 percent share of the market for commercial HMO and PPO health insurance in its Service Area of Alabama.  But for the illegal territorial restrictions summarized above, Blue Cross and Blue Shield of Alabama would be likely to offer its health insurance services and products in Texas in competition with BCBSTX.  Such competition would result in lower health care costs and premiums paid by BCBSTX enrollees.

107.    In addition to the foregoing examples, there are dozens of other Blue plans that would and could compete in Texas but for the illegal territorial restrictions.  As alleged above, fifteen of the twenty-five largest health insurance companies in the country are Blue plans: if all of these plans, together with all other BCBSA members, were able to compete in Texas, the result would have been lower costs and thus lower premiums paid

by BCBSTX enrollees, including Plaintiff.

108. Upon information and belief, over the past two decades (if not longer), numerous Blue plans have adopted what are described in the industry as "Most Favored Nation" ("MFN") clauses in their reimbursement agreements.

109. MFNs (also known as "most favored customer," "most favored pricing," "most favored discount," or "parity" clauses) require a service provider to charge a Blue entity's competitors either more than, or no less than, what the provider charges the Blue entity for the same services.  MFNs that require the amount the provider charges the Blue entity's competitor to be higher than the amount the provider charges the Blue entity are often known as "MFN plus" clauses, and typically require the amount to be higher by a specified percentage.

110. Upon information and belief, BCBSTX's use of MFNs unreasonably reduces competition for a number of reasons. First, MFNs establish that the dominant market provider will be charged the lowest prices charged, thus making the dominant provider indifferent to the actual price charged.  The MFNs thus reduce competition by eliminating an incentive for BCBSTX to reduce overhead prices.

111. Second, MFNs limit competition by preventing other health insurers in Texas from achieving lower costs with providers and thereby becoming significant competitors to BCBSTX.  MFNs establish a price floor below which providers will not sell services to BCBSTX's competitors; indeed, MFNs enable BCBSTX to raise that price floor.  This deters cost competition among health insurers in Texas.  By reducing the ability of BCBSTX's competitors to compete against BCBSTX, MFNs ensure that BCBSTX can

substantially raise premiums while maintaining, or even increasing, its market share.

112. Moreover, upon information and belief, if BCBSTX is certain that no insurer will pay less to a provider than it will, BCBSTX will be willing to pay more to that provider than it would otherwise. The more BCBSTX agrees to pay that provider, the more BCBSTX's competitors must pay that provider. And by raising the price floor, BCBSTX keeps other insurers' costs artificially high, forcing those insurers to offset the higher costs by raising premiums. As a result, and because of its market power, BCBSTX can pass its own higher costs onto consumers through higher premiums without fearing that its competitors will be able to reduce premiums and draw consumers from BCBSTX.

113. Third, MFNs raise barriers to entry in the market for commercial health insurance. If a provider can reduce the price it charges an insurer with little to no market share only by reducing the price it charges market-dominant BCBSTX, the provider has a strong incentive not to lower prices. Without the ability to compete on price, a new competitor will be unable to price below BCBSTX, and thus will be unable to survive.

114. Upon information and belief, the independent Blue Cross and Blue Shield licensees, including BCBSTX, use MFNs to exploit the monopoly power they hold in their respective Service Areas. The independent Blue Cross and Blue Shield licensees, including BCBSTX, have coordinated their use of MFNs with other Blue entities.

115. BCBSTX has market power in the sale of full-service commercial health insurance to individuals and small groups in relevant geographic markets throughout the State of Texas.

## RELEVANT PRODUCT MARKET

116.     The relevant product market is the sale of full-service commercial health insurance

products to individuals and small groups.

117.     To properly define a health insurance product market, it is useful to consider the range of

health insurance products for sale and the degree to which these products substitute for

one another, *i.e.*, whether, in a competitive market, an increase in the price of one product

would increase demand for the second product.   The characteristics of different products

are important factors in determining their substitutability.   For a health insurance product,

important characteristics include:

a.      Commercial versus government health insurance: Unlike commercial health
insurance products, government health insurance programs such as Medicare and
Medicaid and privately operated government health insurance programs such as
Medicare Advantage are available only to individuals who are disabled, elderly, or
indigent.  Therefore, commercial health insurance and government health
insurance programs are not substitutes.

b.      Full-service versus single-service health insurance: Full-service health insurance
provides coverage for a wide range of medical and surgical services provided by
hospitals, physicians, and other health care providers.  In contrast, single-service
health insurance provides narrow coverage restricted to a specific type of health
care, *e.g.*, dental care.  Single-service health insurance is sold as a compliment to
full-service health insurance when the latter excludes from coverage a specific
type of health care, e.g., dental care.  Thus, full-service health insurance and
single-service health insurance are not substitutes.  Full-service commercial health
insurance includes HMO products and PPO products, among others.
Traditionally, HMO health insurance plans pay benefits only when enrollees use
in-network providers; PPO health insurance plans pay a higher percentage of costs
when enrollees use in-network providers and a lower percentage of costs when
enrollees use out-of-network providers.  Both types of full-service commercial
health insurers compete for consumers based on the price of the premiums they
charge, the quality and breadth of their health care provider networks, the benefits
they do or do not provide (including enrollees' out-of-pocket costs such as
deductibles, co-payment, and coinsurance), customer service, and reputation,
among other factors.  Economic research suggests that HMO and PPO health

insurance products are substitutes.

c.    Fully-insured health insurance versus ASO products:  When a consumer purchases a fully-insured health insurance product, the entity from which the consumer purchases that product provides a number of services: it pays its enrollees' medical costs, bears the risk that its enrollees' health care claims will exceed its anticipated losses, controls benefit structure and coverage decisions, and provides "administrative services" to its enrollees, *e.g.*, processes medical bills and negotiates discounted prices with providers.  In contrast, when a consumer purchases an administrative services only ("ASO") product, sometimes known as "no risk," the entity from which the consumer purchases that product provides administrative services only.  Therefore, fully-insured health insurance products and ASO products are only substitutes for those consumers able to self-insure, *i.e.*, able to pay their own medical costs and bear the risk that claims will exceed their anticipated losses.

d.    Individual, small group, and large group consumers:  Consumers of health insurance products include both individuals and groups, such as employers who select a plan to offer to their employees and typically pay a portion of their employees' premiums. Group consumers are broken down into two categories, small group and large group, based on the number of persons in the group. The Kaiser Family Foundation, which publishes an influential yearly survey of employer health benefits offered across the United States, defines small firms as those with 3-199 employees and large firms as those with 200 or more employees. For the purposes of market division, it is appropriate to consider the individual and small group health insurance product market as distinct from the large group health insurance product market.  In the former, consumers are largely unable to self-insure and competition is therefore restricted to plans that offer fully-insured health insurance products; in the latter, consumers are able to self-insure and the bulk of competition occurs between firms offering ASO products.  For example, across the United States, 84 percent of small group consumers do not self-insure, while 83 percent of large group consumers do self-insure.  Even apart from the prevalence of ASO products in each market, individual, small group, and large group product markets are distinct because health insurers can set different prices for these different consumers.  Thus, pricing in the large group market would not impact competition in the small group market, and vice versa.

e.    Data on enrollment in full-service commercial health insurance: According to the American Medical Association, although Texas licenses companies to offer some type of health insurance in Texas, Blue Cross had 40% of the commercial market share statewide.  In certain markets, BCBSTX commands in excess of half the market.  In Laredo it controls 67%, while its nearest competitor, United Healthcare, has 14 percent. Longview 69%; United Healthcare 26%.  Midland

60%; United Healthcare 20%.  Odessa 60%; Covenant 16%.  San Angelo 72;
Aetna 13%.  Tyler 70%; United Healthcare 19%.  Victoria 75%; United
Healthcare 18%.  Wichita Falls 81%; United Healthcare 13%.

### RELEVANT GEOGRAPHIC MARKETS

118.   In defining a geographic market, it is important to focus on an essential part of a

full-service commercial health insurer's product: its provider network. An insurer's

provider network is composed of the health care providers with which it contracts.

Enrollees in both HMO and PPO full-service commercial health insurance products pay

less for an "in-network" provider's health care services than they would for the same

services from an "out of network" provider.  As a result, health insurance consumers pay

special attention to an insurer's provider network when choosing a health insurance

product, preferring insurers with networks that include local providers.  This suggests that

health insurers compete in distinct geographic markets.

119.   There are a number of different ways to analyze the geographic markets for the sale of

full-service commercial health insurance to individual and small group consumers in

Texas. The potentially relevant geographic markets could be defined alternatively as (a)

the entire state of Texas; (b) the 24 regions, known as "Metropolitan Statistical Areas," or

42 "Micropolitan Statistical Areas," into which the U.S. Office of Management and

Budget divides Texas.  However the geographic market is defined, the result is the same:

BCBSTX has the dominant market position, and exercises market power.  In the 26

regional markets studied by the American Medical Association, BCBSTX dominated all

but four regions, and was a close second in market share in three of the regions.

120.   BCBSTX does business throughout the State of Texas, is licensed to use the Blue Cross

and Blue Shield trademarks and trade names throughout the State of Texas, and has agreed with the other member plans of BCBSA that only BCBSTX will do business in Texas under the Blue brand.  Therefore, the State of Texas can be analyzed as a relevant geographic market within which to assess the effects of BCBSTX's anti-competitive conduct.

121.    The U.S. Office of Management and Budget divides the counties of the state of Texas into Metropolitan Statistical Areas and Micropolitan Statistical Areas according to published standards applied to U.S. Census Bureau data.  It states that "[t]he general concept of a metropolitan or micropolitan statistical area is that of a core area containing a substantial population nucleus, together with adjacent communities having a high degree of economic and social integration with that core." Therefore, each of Texas's 24 Metropolitan Statistical Areas, 42 Micropolitan Statistical Areas, and the remaining counties that are not part of Statistical Areas is a relevant geographic market within which to assess the effects of BCBSTX's anti-competitive conduct.

122.    BCBSTX's powerful market share is far from the only evidence of its market power.  As alleged below, BCBSTX's market power has significantly raised costs, resulting in skyrocketing premiums for BCBSTX enrollees.

123.    Moreover, BCBSTX's statewide share of the relevant product market has increased each year despite its substantial premium increases.  BCBSTX's ability to retain and increase enrollment while charging artificially inflated and supra-competitive prices is evidence of its market power.

### INFLATED PREMIUMS CHARGED BY BCBSTX

124.   For at least the past ten years, BCBSTX's illegal anti-competitive conduct, including its

territorial market division agreements with the thirty-seven other members of BCBSA,

has increased health care costs in Texas, leading to artificially-inflated and

supra-competitive premiums for individuals and small groups purchasing BCBSTX's

full-service commercial health insurance in the relevant geographic market(s).  Upon

information and belief, BCBSTX's market power and its use of MFNs and other

anti-competitive practices in Texas have reduced the amount of competition in the market

and ensured that BCBSTX's few competitors face higher costs than BCBSTX does.

Without competition, and with the ability to increase premiums without losing customers,

BCBSTX faces little pressure to keep costs low.

125.   Over the past decade, BCBSTX generally raised individual and small group premiums by

amounts greater than the national average. Most states regulate what companies charge

their residents for health insurance. But in Texas, the majority of life, accident and health

insurance rate hikes are never filed with the Texas Department of Insurance, according to

the Texas Sunset Commission.  Except for Medicare supplemental insurance, no prior

state approval is needed to increase health insurance premiums.  However, health insurers

are required to file rate increases that affect people who buy their own health insurance –

about 4 percent of all Texans –  but the filing is mostly for informational, not regulatory

purposes. Most everyone else is either uninsured or covered by Medicaid, Medicare or

employer-provided health insurance, none of which the state regulates.  State law holds

that insurance rates in Texas must be just, fair, reasonable, adequate, not confiscatory, not

excessive and not unfairly discriminatory.  According to the Austin American Statesman,

Katrina Daniel, senior associate commissioner at the state insurance department, reported

that Blue Cross Blue Shield of Texas filed 60 rate increases for individual policyholders

from January to October 2009 ranging from 3 percent to 25 percent.

126.    These rising premiums have enabled BCBSTX to grow its surplus in excessive amounts,

which is an unusual practice for a self-described nonprofit organization.

## CAUSES OF ACTION

127.    **COUNT ONE**.  (Contract, Combination, or Conspiracy in Restraint of Trade in Violation

of Section 1 of The Sherman Antitrust Act (15 U.S.C. §§ 1–7)).  Plaintiffs repeat and

re-alleges the allegations in the foregoing paragraphs.

128.    The License Agreements, Membership Standards, and Guidelines agreed to by BCBSTX

and BCBSA represent horizontal agreements entered into between BCBSTX and the

thirty-seven other member plans of BCBSA, all of whom are competitors or potential

competitors in the market for commercial health insurance.

129.    Each of the License Agreements, Membership Standards, and Guidelines entered into

between BCBSA and BCBSTX represents a contract, combination, and conspiracy within

the meaning of The Sherman Antitrust Act.

130.    Through the License Agreements, Membership Standards, and Guidelines, BCBSA and

BCBSTX have agreed to divide and allocate the geographic markets for the sale of

commercial health insurance into a series of exclusive areas for each of the thirty-eight

BCBSA members.  By so doing, BCBSTX and  BCBSA (and its members) have

conspired to restrain trade in violation of The Sherman Antitrust Act.  These market

allocation agreements are per se illegal under the aforesaid provisions.

131.   The market allocation agreements entered into between BCBSTX and the thirty-seven

other BCBSA member plans (executed through the BCBSA License Agreements and

related Membership Standards and Guidelines) are anti-competitive.

132.   BCBSTX has market power in the sale of full-service commercial health insurance to

individuals and small groups in each relevant geographic and product market alleged

herein.

133.   Each of the challenged agreements has had substantial and unreasonable anti-competitive

effects in the relevant markets, including but not limited to:

    a.    Reducing the number of health insurance companies competing with BCBSTX
throughout Texas;

    b.    Unreasonably limiting the entry of competitor health insurance companies into
Texas;

    c.    Allowing BCBSTX to maintain and enlarge its market power throughout Texas;

    d.    Allowing BCBSTX to raise the premiums charged to consumers by
artificially-inflated, unreasonable, and supra-competitive amounts;

    e.    Depriving consumers of health insurance of the benefits of free and open
competition.

134.   The pro-competitive benefits, if any, of the market allocation agreements alleged above

do not outweigh the anti-competitive effects of those agreements.

135.   The market allocation agreements in the License Agreements, Membership Standards,

and Guidelines unreasonably restrain trade in violation of Section 1 of The Sherman

Antitrust Act.

136.   As a direct and proximate result of  Defendants continuing violations of Section 1 of The

Sherman Antitrust Act, Plaintiffs and other members of the Class have suffered injury and damages in an amount to be proven at trial.  These damages consist of having paid higher health insurance premiums to BCBSTX than they would have paid with increased competition and but for the violations of The Sherman Antitrust Act.

137.   Plaintiff and the Class seek treble damages under 15 U.S.C. § 15(a) from Defendants for their violations of Section 1 of The Sherman Antitrust Act.

138.   **COUNT TWO**.  (MFNs; Section 1 of The Sherman Antitrust Act (15 U.S.C. §§ 1–7) and Section 3 of The Clayton Antitrust Act of 1914 (15 U.S.C. §§ 12–27, 29 U.S.C. §§ 52–53)).

139.   Plaintiff repeats and re-alleges the allegations in the foregoing paragraphs.

140.   BCBSTX has market power in the sale of commercial health insurance to individuals and groups in each relevant geographic market alleged herein.

141.   The provider agreements BCBSTX entered into between BCBSTX and health care providers in Texas that contain MFN provisions constitute contracts, combinations, and conspiracies within the meaning of  The Sherman Antitrust Act, as well fixes a price charged therefor, or discount from, such price, on the condition, agreement, or understanding that the provider shall not use less favorable terms with a BCBSTX competitor substantially lessening the competition or tending to create a monopoly.  Each of the BCBSTX provider agreements containing an MFN has had substantial and unreasonable anticompetitive effects in the relevant markets, including but not limited to:

   a.      Raising the prices of health care services to commercial health insurers in competition with BCBSTX;

b.      Unreasonably restricting price and cost competition among commercial health insurers by limiting or preventing commercial health insurance in competition with BCBSTX from obtaining competitive pricing from health care providers;

c.      Unreasonably restricting the ability of health care providers to offer to BCBSTX's competitors or potential competitors reduced prices for services that the health care providers and insurers consider to be in their mutual interest;

d.      Depriving consumers of health care services and health insurance of the benefits of free and open competition.

142.    The pro-competitive benefits, if any, of the BCBSTX provider agreements containing MFN provisions do not outweigh the anti-competitive effects of the agreements.

143.    Each agreement between BCBSTX and a health care provider that contains an MFN unreasonably restrains trade in violation of The Sherman Antitrust Act and The Clayton Antitrust Act.

144.    As a direct and proximate result of BCBSTX's continuing violations of The Sherman Antitrust Act and The Clayton Antitrust Act, Plaintiffs and other members of the Class have suffered injury and damages in an amount to be proven at trial. These damages consist of having paid higher health insurance premiums to BCBSTX than they would have paid but for the violations of The Sherman Antitrust Act.

145.    Plaintiff and the Class seek treble damages under 15 U.S.C. § 15(a) from BCBSTX for its violations of Section 1 of The Sherman Antitrust Act and Section 3 of The Clayton Antitrust Act.

146.    **COUNT THREE**.  (Willful Acquisition and Maintenance of a Monopoly in the Relevant Market for Private Health Insurance in Violation of Section 2 of The Sherman Antitrust Act (15 U.S.C. §§ 1–7)).

147.   Plaintiff repeats and re-alleges the allegations in the foregoing paragraphs.

148.   BCBSTX has monopoly power in the individual and small group full-service commercial

health insurance market in Texas.  This monopoly power is evidenced by, among other

things:

    a.     BCBSTX's ability, upon information and belief, to enter into MFN agreements
with providers, which evidences BCBSTX's  ability to control prices and exclude
competitors;

    b.     BCBSTX's high market share of the commercial health insurance market,
including its increasing market share even as it has raised premiums.

    c.     BCBSTX has abused and continues to abuse its monopoly power in order to
maintain and enhance its market dominance by unreasonably restraining trade,
thus artificially inflating the premiums it charges to consumers.

149.   BCBSTX's conduct constitutes unlawful monopolization and is unlawful anti-competitive

conduct in the relevant markets in violation of Section 2 of The Sherman Antitrust Act.

150.   As a direct and proximate result of BCBSTX's continuing violations of The Sherman

Antitrust Act, Plaintiffs and other members of the Class have suffered injury and damages

in an amount to be proven at trial.  These damages consist of having paid higher health

insurance premiums to BCBSTX than they would have paid but for these violations.

151.   Plaintiff and the Class seek treble damages under 15 U.S.C. § 15(a) from BCBSTX for its

violations of Section 2 of The Sherman Antitrust Act

152.   **COUNT FOUR.**  (Willful Attempted Monopolization in the Relevant Market for Private

Health Insurance in Violation of Section 2 of The Sherman Antitrust Act).

153.   Plaintiff repeats and re-alleges the allegations in the foregoing paragraphs.

154.   BCBSTX has acted with the specific intent to monopolize the relevant markets.

155. There was and is a dangerous possibility that BCBSTX will succeed in its attempt to monopolize the relevant markets because BCBSTX already controls a large percentage of those markets.  Further success by BCBSTX in excluding competitors from those markets is an attempt to monopolize, or attempt to combine or conspire to monopolize, will confer a monopoly on BCBSTX in violation of Section 2 of The Sherman Antitrust Act.

156. BCBSTX's attempted monopolization of the relevant markets has harmed competition in those markets and has caused injury to Plaintiffs and the Class.  Premiums charged by BCBSTX have been higher than they would have been in a competitive market.

157. Plaintiffs and the Class have been damaged as the result of BCBSTX's attempted monopolization of the relevant markets and seek treble damages.

158. **COUNT FIVE.** (Unjust Enrichment).  Plaintiffs incorporate and re-allege each of the foregoing paragraphs.

159. BCBSTX has benefitted from its unlawful acts through the overpayments for health insurance premiums by Plaintiffs and the other Class members.

160. It would be inequitable for BCBSTX to be permitted to retain the benefit of these overpayments that were conferred by Plaintiffs and the Class and retained by BCBSTX.

161. By reason of its unlawful conduct, BCBSTX must make restitution to Plaintiffs and the Class.  Further, any action which might have been taken by Plaintiffs to pursue administrative remedies would have been futile.

162. In equity, BCBSTX should not be allowed to retain the economic benefit derived from said improper conduct and should be ordered to pay restitution and pre-judgment interest to Plaintiffs and Class members.

**PRAYER FOR RELIEF**

163.    WHEREFORE, Plaintiffs pray:

a.    That the summons be issued and that Defendants be duly served with a copy of this Complaint and required to answer same, and that this Court decree and enter judgment;

b.    That the Court determine that this action may be maintained as a class action under Federal Rule of Civil Procedure Rule 23 and appoint the Plaintiffs as representatives of the Class;

c.    That the Court adjudge and decree that Defendants have violated Section 1 of The Sherman Antitrust Act (15 U.S.C. §§ 1–7); Section 2 of the Sherman Act; and Section 3 of The Clayton Antitrust Act of 1914 (15 U.S.C. §§ 12–27, 29 U.S.C. §§ 52–53) and award Plaintiffs and the Class appropriate damages and relief;

d.    That the Court award compensatory damages to Plaintiffs and the Class resulting from the various acts of wrongdoing under the Antitrust laws, in such amounts as represent the losses reasonably suffered by Plaintiffs and the Class, as well as any treble damages available under 15 U.S.C. § 15(a);

e.    That the Court award Plaintiffs their reasonable costs;

f.    That the Court render judgment that Defendants have been unjustly enriched by its wrongful conduct, and award restitution to Plaintiffs and the Class;

g.    That the Court award Plaintiffs and the Class all available pre-judgment and post-judgment interest, to the fullest extent available under law or equity;

h.    That the Court orders such other, further and general relief as is just and proper.

Respectfully submitted,

**THE COWAN LAW FIRM**


    S/ R. Christopher Cowan
R. Christopher Cowan
Texas Bar No. 00787294
209 Henry Street
Dallas, Texas 75226-1819
214/826-1900
214/826-8900 Fax
chris@cowanlaw.net

**PENDLEY, BAUDIN & COFFIN, L.L.P.**

Nicholas R. Rockforte (LA Bar #31305)
Patrick W. Pendley (LA Bar #14021)
Stan P. Baudin (LA Bar #22937)
Christopher L. Coffin (LA Bar # 27902)
Post Office Drawer 71
Plaquemine, Louisiana 70765
225/687-6396
225/687-6398
pwpendley@pbclawfirm.com

**BALL & SCOTT LAW OFFICES**

Gordon Ball (TN BPR# 1135)
gball@ballandscott.com
Thomas S. Scott, Jr. (TN. BPR# 1086)
scott@ballandscott.com
Christopher T. Cain (TN BPR# 19997)
cain@ballandscott.com
Bank of America Center, Suite 601
550 Main Street
Knoxville, Tennessee 37902
865/525-7028
865/525-4679

**ATTORNEYS FOR PLAINTIFFS**